## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

LACKAWANNA ENERGY CENTER LLC,

*Petitioner*,

v.

FEDERAL ENERGY
REGULATORY COMMISSION,

*Respondent*.

No. 24-1307

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Federal Rule of Appellate Procedure 15, and D.C. Circuit Rule 15, Lackawanna Energy Center LLC ("Lackawanna") hereby petitions for review of the following orders of Respondent the Federal Energy Regulatory Commission ("Commission"):

1. *Lackawanna Energy Center LLC v. PJM Interconnection, L.L.C.*, "Order Denying Complaint," Docket No. EL24-64-000, 187 FERC ¶ 61,089 (May 23, 2024) (the "May Order") (attached as Exhibit A); and

2. *Lackawanna Energy Center LLC v. PJM Interconnection, L.L.C.*, "Notice of Denial of Rehearing by Operation of Law and Providing for Further

Consideration," Docket No. EL24-64-001, 188 FERC ¶ 62,041 (July 22, 2024) (attached as Exhibit B).

Lackawanna participated in the Commission proceedings below and timely filed a request for rehearing of the May Order.  As explained in the Commission's Notice of Denial of Rehearing, that rehearing request may be deemed denied by operation of law because the Commission did not act upon it within 30 days.  *See* 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713(f); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18–19 (D.C. Cir. 2020).  Therefore, Lackawanna may file this petition for review under 16 U.S.C. § 825*l*(b).  This Court has jurisdiction, and venue in this Court is proper, under 16 U.S.C. § 825*l*(b).

Date: September 20, 2024

Respectfully submitted,

*/s/ Jeremy C. Marwell*

Holly Rachel Smith
Deputy General Counsel – Regulatory
Invenergy LLC
One South Wacker Drive
Suite 1800
Chicago, IL 60606
Phone: 312.761.9203
Email: HSmith@invenergy.com

William S. Scherman
Jeremy C. Marwell
Jeffrey M. Jakubiak
Andrew D. DeVore
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

Garrett T. Meisman
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: 713.758.2559
Email: gmeisman@velaw.com

*Counsel for Lackawanna Energy Center LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Lackawanna Energy Center LLC, through undersigned counsel, certifies as follows:

Lackawanna Energy Center LLC is a limited liability company organized under the laws of the state of Delaware, which owns and operates a natural gas-fired electric generation facility located in Lackawanna County, Pennsylvania.

Lackawanna Energy Center LLC has parent entities Lackawanna Energy Holdings LLC, Lackawanna Subordinated Financing LLC, Lackawanna Subordinated Financing Holdings LLC, and Lackawanna Energy Partners LLC ("LEP"). The direct ownership interests in LEP are comprised of Class A and Class B membership units. GEP Lackawanna Holdings LLC ("GEP Holdings") directly owns 87.71% of the Class A membership units; Invenergy Lackawanna Pref Holdings LLC ("Invenergy LPH") directly owns 12.29% of the Class A membership units; and Invenergy Lackawanna Holdings LLC ("Invenergy LH") directly owns 100% of the Class B membership units.

GEP Holdings is wholly-owned by GEP Lackawanna Parent LLC ("GEP Parent") which in turn is owned 82.92% by GEPIF II Bravo AIV, L.P. ("GEPIF Bravo") and 14.75% by GEPIF Lackawanna Co-Investment, L.P. ("Co-Invest"). Each of GEPIF Bravo and Co-Invest is managed and controlled by its

general partner, Global Energy & Power Infrastructure GP II, L.P. ("GEPI GP II"). GEPI GP II is managed and controlled by its general partner, Global Energy & Power Infrastructure GP II Limited ("GEPI GP II Limited"). All of the shareholder interests in GEPI GP II Limited are held by BFM Holdco LLC, which is a subsidiary of BlackRock Financial Management, Inc., BlackRock Holdco 2 Inc., and BlackRock, Inc. ("BlackRock") (NYSE: BLK). BlackRock is a publicly traded investment management firm that provides investment-management-related services to investment accounts, mutual funds and other investment funds domiciled in the United States and foreign countries.

Each of Invenergy LPH and Invenergy LH are indirect, wholly-owned subsidiaries of Invenergy AMPCI Thermal Power LLC ("Invenergy AMPCI"). Invenergy AMPCI has parent entities InfraBridge North America Thermal Power Acquisition LLC ("InfraBridge NA"), Invenergy Clean Power LLC ("Invenergy Clean Power"), Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC. InfraBridge NA and Invenergy Clean Power each hold a 50% interest in Invenergy AMPCI. InfraBridge NA has parent entities InfraBridge North America Thermal Power Holdings LP, InfraBridge North America Thermal Power Intermediate LP, InfraBridge North America Thermal Power Midco LP, GIF II US Aggregator LP, InfraBridge Global Infrastructure Fund II A LP (Luxemburg),

InfraBridge Global Infrastructure Fund II B LP (Luxemburg), InfraBridge Global Infrastructure Fund II C LP (Luxemburg), InfraBridge Global Infrastructure Fund II E LP (Luxemburg),  and, via the general partner, InfraBridge Investors (GIF II GP) S.à.r.l., DB Puma GIF II GP Holdco, LLC, DB Puma GP Holding, LLC, DB Puma Master Holdco, LLC, DigitalBridge Operating Company, LLC, and DigitalBridge Group, Inc. (NYSE: DBRG).

Although the above-mentioned publicly held companies constitute "parent" entities within the meaning of D.C. Circuit Rule 26.1(a) by virtue of their control over their respective general partner entities, the general partner entities do not hold significant equity interests in their respective limited partnerships.  No publicly held company owns 10% or more equity interest in Lackawanna Energy Center LLC.

Date:  September 20, 2024                    /s/ Jeremy C. Marwell

Holly Rachel Smith                          William S. Scherman
Deputy General Counsel – Regulatory         Jeremy C. Marwell
Invenergy LLC                               Jeffrey M. Jakubiak
One South Wacker Drive                      Andrew D. DeVore
Suite 1800                                  Vinson & Elkins LLP
Chicago, IL 60606                           2200 Pennsylvania Avenue, NW
Phone: 312.761.9203                         Suite 500 West
Email: HSmith@invenergy.com                 Washington, DC  20037
                                            Phone: 202.639.6507
                                            Email: jmarwell@velaw.com

                                            Garrett T. Meisman
                                            845 Texas Avenue
                                            Suite 4700
                                            Houston, Texas 77002
                                            Phone: 713.758.2559
                                            Email: gmeisman@velaw.com


          *Counsel for Lackawanna Energy Center LLC*

## **CERTIFICATE OF SERVICE**

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), I hereby certify that on September 20, 2024, I caused to be served copies of the foregoing Petition for Review, Exhibits, and Corporate Disclosure Statement by U.S. Priority Mail, postage prepaid, on:

Hon. Debbie-Anne A. Reese, Acting Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

Robert Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

and on all the individuals who appear on the appended service list.

Pursuant to Rule 2012 of the Federal Energy Regulatory Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2012, I will also provide a date-stamped copy of the foregoing documents to the Office of the Secretary of the Federal Energy Regulatory Commission once a date-stamped copy is available

Date:  September 20, 2024        */s/ Jeremy C. Marwell*

Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
jmarwell@velaw.com

*Counsel for Lackawanna Energy Center LLC*

| Service List | | |
|---|---|---|
| **Party** | **Name** | **Address** |
| American Electric Power Service Corporation | Jessica Cano<br>Takis Laios | 1 Riverside Plaza<br>Columbus, Ohio 43215 |
| American Electric Power Service Corporation | Stacey Burbure<br>LaChon Turner | 801 Pennsylvania Avenue, NW, Suite 735<br>Washington, DC 20004 |
| Calpine Corporation | Rachael Marsh<br>Sarah Novosel<br>David Scarpignato | 717 Texas Avenue, Suite 1000<br>Houston, Texas 77002 |
| Constellation Energy Generation, LLC | Christopher Wilson<br>Carrie Allen | 101 Constitution Ave, NW<br>Suite 400 East<br>Washington, DC 20001 |
| Constellation Energy Generation, LLC | Adrien Ford | 344 Homestead Rd.<br>Wayne, PA 19087 |
| Midwest Generation, LLC | Neal Fitch<br>Cortney Slager<br>Jennifer Hsia | 804 Carnegie Ctr.<br>Princeton, NJ 08540 |
| Monitoring Analytics, LLC | Jeffrey Mayes<br>Joseph Bowring<br>Suzette N. Krausen | 2621 Van Buren Avenue, Suite 160<br>Valley Forge Corporate Center<br>Eagleville, PA 19403 |
| NRG Business Marketing LLC | Neal Fitch<br>Cortney Slager<br>Jennifer Hsia | 804 Carnegie Center Dr.<br>Princeton, NJ 08540 |
| Old Dominion Electric Cooperative | Griffin C. Rice<br>Jecoliah R. Williams | Thompson Coburn LLP<br>1909 K Street NW, Suite 600<br>Washington, DC 20006 |
| PJM Interconnection, L.L.C. | Thomas DeVita | 2750 Monroe Blvd.<br>Audubon, PA 19403 |
| PJM Interconnection, L.L.C. | Craig Glazer<br>Wendy B. Warren | 1200 G St NW, Suite 600<br>Washington, DC 20005 |

10

| Service List | | |
|---|---|---|
| **Party** | **Name** | **Address** |
| PPL Electric Utilities Corporation | Steven Nadel | 2 North 9th St<br>Allentown, PA 18101 |
| Public Citizen, Inc. | Tyson Slocum | 215 Pennsylvania Ave. SE<br>Public Citizen, Inc.<br>Washington, DC 20003 |

# Exhibit A

187 FERC ¶ 61,089
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Allison Clements and Mark C. Christie.

| | |
|---|---|
| Lackawanna Energy Center LLC | Docket No. EL24-64-000 |
| v. | |
| PJM Interconnection, L.L.C. | |

ORDER DENYING COMPLAINT

(Issued May 23, 2024)

1.      On January 25, 2024, pursuant to sections 206, 306, and 309 of the Federal Power Act (FPA)[1] and Rule 206 of the Commission's Rules of Practice and Procedure,[2] Lackawanna Energy Center LLC (Lackawanna) filed a complaint against PJM Interconnection, L.L.C. (PJM) alleging that PJM failed to reimburse Lackawanna for the lost opportunity costs (LOC) it incurred as a result of PJM allegedly having inappropriately curtailed Lackawanna's output from May 19, 2023 through June 10, 2023 in connection with an outage of the Juniata-Sunbury 500 kV transmission line (Juniata-Sunbury Outage).  As discussed below, we deny the complaint.

## I.      **Background**

2.      On February 17, 2022, the Commission accepted PJM's proposal to make generators ineligible to receive LOC payments when PJM directs them to reduce output temporarily to prevent generator loss of synchronization due to stability limits on the transmission system.[3]

3.      In that order, the Commission found that generators do not experience a lost opportunity when PJM directs them to back down due to a stability limit on the transmission system and that generators were already sufficiently incentivized to

---

[1] 16 U.S.C. §§ 824e, 825d, 825h.

[2] 18 C.F.R. § 385.206 (2023).

[3] *PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,111 (2022) (Stability Limits Order).

operate within stability limits in order to avoid any potential physical harm to their resource.[4] Thus, the Commission reasoned that LOC payments would be unnecessary when a generator faces a stability constraint.[5] The Commission also dismissed arguments that generators that are equipped with relays that will automatically disconnect the generator to avoid damage should still be compensated for lost opportunity, finding that "we remain unpersuaded that there is a legitimate opportunity to operate above stability limits that would obligate PJM to provide LOC payments."[6]

4.     As part of the enhancements to the stability limits process, PJM explained that it establishes appropriate stability limits using reliability studies from PJM's Transient Stability Analysis (TSA) tool. PJM's TSA tool monitors and determines transient stability of the PJM system subject to a select set of Energy Management System (EMS) contingencies for balanced and unbalanced faults.[7] In the Stability Limits Order, the Commission noted that the TSA tool models protective equipment, such as power system stabilizers and automatic voltage regulators, when establishing stability limits.[8]

## II.     **Complaint**

5.     Lackawanna states that it is a 1,498 MW (nameplate) combined cycle natural gas-fired generation facility located in Lackawanna County, Pennsylvania.[9] Lackawanna notes that the PJM Open Access Transmission Tariff (Tariff) and Operating Agreement provide generators with LOC when generator output is reduced or suspended due to a transmission constraint or other reliability issue.[10]

6.     Lackawanna states that, in May 2021, PJM posted notice on its Open Access Same-Time Information System of a transmission outage on the Juniata-Sunbury

---

[4] *Id.* P 31.

[5] *Id.*

[6] *Id.*

[7] PJM, Rate Component of Enhancements to Stability Limits Process, Docket No. ER21-1802-000, at 3-4 & n. 12 (filed Apr. 30, 2021) (Stability Limits Filing); *see also* PJM, *PJM Manual 3: Transmission Operations* § 3.9 (Nov. 15, 2023) https://pjm.com/-/media/documents/manuals/m03.ashx (PJM Manual 3).

[8] Stability Limits Order, 178 FERC ¶ 61,111 at P 31 n.35.

[9] Complaint at 9.

[10] *Id.*

transmission line planned for May 19 through June 10 of 2023.[11]  Lackawanna states that this posting did not identify Lackawanna as a stability limited generator for the Juniata-Sunbury line, and that it was notified three days before the outage commenced that it would require Lackawanna to reduce its output due to a stability limit.[12]

7.      Lackawanna claims that PJM is improperly withholding LOC payments from Lackawanna in violation of the Tariff and the filed rate.[13]  Lackawanna requests that the Commission direct PJM to pay Lackawanna LOC for PJM's curtailment of Lackawanna's output between May 19, 2023 and June 10, 2023.  Lackawanna argues that the filed rate requires PJM to pay Lackawanna LOC during the Juniata-Sunbury Outage.[14]  Lackawanna states that PJM dispatched Lackawanna down to mitigate a reliability issue caused by PJM's removal of a 500 kV transmission line from service for maintenance.[15]  Lackawanna asserts that, on some days during the Juniata-Sunbury Outage, Lackawanna cleared in the day-ahead market but was manually dispatched down by PJM, and on other days Lackawanna's output was reduced by PJM notwithstanding the fact that Lackawanna submitted offers in the real-time market that were below the real-time LMP.  Lackawanna argues that, in such circumstances, the Tariff provides for it to receive LOC payments.[16]

8.      Lackawanna notes that the Stability Limit Filing accepted by the Commission makes stability limited generators ineligible for LOC payments.[17]  However, Lackawanna states that the Tariff changes approved in the Stability Limit Order are not actually reflected in the effective eTariff record or on PJM's website.[18]  Lackawanna states that while the Commission approved this Tariff provision effective June 1, 2022, the

---

[11] *Id.* at 12.

[12] *Id.*

[13] *Id.* at 14.

[14] *Id.*

[15] *Id.* at 15.

[16] *See id.* at 14-15.

[17] *Id.* at 16.

[18] *Id.* at 10.

Docket No. EL24-64-000                                                    - 4 -

provision only existed within the four corners of PJM's Tariff until October 2022, and that it is no longer in the effective eTariff record or on PJM's website.[19]

9.      Lackawanna argues that Lackawanna was not a stability limited generator and therefore remains entitled to LOC payments.[20]  Lackawanna argues that the Tariff is silent and provides no explanation for what constitutes a stability limitation, when one will be in effect, or when a generator output constraint is necessary to address such a limitation. Lackawanna argues that, in such circumstances, the Commission must consider extrinsic evidence, including PJM's transmittal letter, to interpret the meaning of the Tariff.

10.     Lackawanna states that the Stability Limits Filing defined "stability limits" as "*temporary limitations* on the output of generators that PJM places into effect during certain transmission outage conditions, so as to prevent transient instability on the Bulk Electric System ("BES") *from causing damage to those generators* due to a loss of synchronization *during an N-1 contingency*."[21]  Lackawanna also notes that PJM had explained that stability limitations are identified as part of PJM's interconnection and other study processes, such that generators have the ability and incentive to mitigate stability issues before they arise.

11.     Lackawanna argues that its curtailment during the Juniata-Sunbury Outage does not satisfy these criteria.[22]  First, Lackawanna argues that the curtailment was not temporary, transient, or limited, as it was curtailed for 23 days.  Second, Lackawanna argues that the curtailment was not to prevent damage to the generators that might occur during an N-1 contingency, but rather to mitigate harms that might occur in the event of subsequent contingency.[23]  Lackawanna additionally notes that its curtailment was not necessary to prevent damage to the facility because it is already equipped with equipment that would have prevented damage to the generator in the event of transient instability.[24]  Lackawanna states that the curtailment, therefore, was to maintain system reliability, not prevent damage to the generator, and in such cases, PJM must provide LOC to the generator.

---

[19] *Id.* at 16 n.41.

[20] *Id.* at 16.

[21] *Id.* at 17 (quoting Stability Limit Filing at 2) (emphasis provided by Complaint).

[22] *Id.*

[23] *Id.* at 17-18.

[24] *Id.* at 18.

Docket No. EL24-64-000                                                                    - 5 -

12.      Lackawanna also argues that the stability limit was not known before the fact as it was not apprised of the stability limits in its interconnection studies, or in the May 2021 outage ticket for the Juniata-Sunbury line.[25]  Lackawanna states that it only learned of the stability limitation three days before the line went out of service.

13.      Lackawanna states that the stability limit placed on Lackawanna therefore does not fall within the narrow circumstances PJM described in the Stability Limits Filing.[26]  Lackawanna states that permitting PJM to now disavow its prior representations to the Commission would deprive generators like Lackawanna of the notice required under the FPA.[27]

14.      Lackawanna further argues that PJM's justifications for making stability limited generators ineligible for LOC payments further demonstrate that the provision does not apply here.[28]  Lackawanna asserts that PJM's justifications include:  (i) providing LOC payments to stability limited generators would disincentivize generators from mitigating the risk of temporary output limitations and (ii) LOC payments are not needed to incentivize generators to follow dispatch instructions because stability limits protect generators from being damaged.[29]  Lackawanna argues that these justifications are inapplicable here.[30]  Lackawanna argues that that absence of LOC payments can only incentivize generators to mitigate against temporary output limitations if PJM makes the generator aware it is a stability limited resource.

15.      Lackawanna argues that there were no further mitigation measures that Lackawanna could have taken.[31]  Lackawanna states that it asked PJM what it could do to mitigate its curtailment and that PJM provided no solutions.[32]  Lackawanna states that it could have relied on its own relays and safety equipment, meaning that it would not have

---

[25] *Id.* at 18-19.

[26] *Id.* at 19.

[27] *Id.* at 20.

[28] *Id.*

[29] *Id.* at 20-21.

[30] *Id.* at 21.

[31] *Id.*

[32] *Id.* at 24.

had incentive to follow PJM's dispatch instructions.[33]  Lackawanna states that it did, however, follow dispatch instructions, to its own financial detriment.[34]  Lackawanna asserts that, if it had been made aware of stability limit issues, it would have taken steps to mitigate those issues, but PJM's inaction deprived Lackawanna of that opportunity. Lackawanna contends that PJM's justifications for its Stability Limits Filing and the Commission's rationale for its Stability Limits Order simply do not apply in these circumstances.

16.    Lackawanna argues that PJM failed to comply with its Manuals in curtailing Lackawanna.[35]  Lackawanna states that, to the extent PJM relies on the fact that its TSA Tool identified Lackawanna as a stability limited generator, that argument is flawed.[36] Lackawanna argues that this tool must be consistent with and cannot supersede the filed-rate and must operate within the parameters PJM identified in the Stability Limits Filing.

17.    Lackawanna states that it had no prior knowledge that it would be stability limited for the Juniata-Sunbury line until right before the outage, despite the outage being posted two years in advance.[37]  Lackawanna also states that it did not receive notice that it would be a stability limited generator in these circumstances through the proceeding addressing the Stability Limits Filing, which notified market participants that generators would not receive LOC payments in different circumstances, but not those present here. Lackawanna asserts it also had no notice through the Tariff, because the relevant provision is not actually in the effective eTariff record or on PJM's website.[38] Lackawanna states that despite requests from Lackawanna for more information, PJM provided no solutions and no data on why Lackawanna was curtailed.[39]

---

[33] *Id.* at 21-22.

[34] *Id.* at 22.

[35] *See id.* at 23-24.

[36] *Id.* at 24.

[37] *Id.*

[38] *Id.* at 24-25.

[39] *Id.* at 25.

18.     Lackawanna states that PJM did not satisfy the filed rate doctrine's notice requirements by its decision to apply a wholly different rate than the one identified in its Stability Limit Filing.[40]  Lackawanna argues that PJM has discretion to operate the transmission system to ensure reliability, but it must do so in a way that is transparent so that market participants are on notice of how the Tariff will be applied.

19.     Lackawanna argues that if the Commission concludes that PJM's Tariff, as written, permits it to withhold LOC payments in the circumstances present here, then the Tariff is unjust, unreasonable, and unduly discriminatory.[41]

20.     Lackawanna argues that the Commission has repeatedly acknowledged the importance of providing LOC payments to generators that are curtailed to maintain transmission system reliability because the payments ensure that resources do not have an incentive to deviate from PJM's dispatch instructions.[42]  Lackawanna asserts that in the Stability Limits Order, the Commission approved PJM's proposal because PJM explained that stability limited generators, unlike other generators, have a "natural incentive" to prevent damage to their facilities.[43]  Lackawanna further argues that withholding LOC from Lackawanna in this case would flip the rationale for PJM's Stability Limit Filing, which the Commission adopted in its Stability Limit Order, on its head.[44]  Lackawanna states that it installed equipment that would have allowed it to safely run above the stability limit without posing a risk to the facility, and thus had no "natural incentive" to follow PJM's dispatch signal.  According to Lackawanna, because it could safely run above the stability limit, PJM's decision to curtail the project cannot be construed as necessary to prevent damage to the facility, but as necessary to maintain system reliability.  Lackawanna asserts that at that point, then, PJM no longer had a rationale for treating Lackawanna differently than any other generator that is provided LOC payments in the event it is curtailed to maintain system reliability.

21.     Lackawanna argues that PJM's refusal to compensate Lackawanna also creates the exact incentive structure the Commission sought to avoid—it discourages generators from taking prophylactic measures to mitigate stability limits.[45]  Lackawanna further

---

[40] *Id.*

[41] *Id.* at 26.

[42] *Id.*

[43] *Id.* at 26-27 (citing Stability Limits Filing at 8).

[44] *Id.* at 27.

[45] *Id.*

argues that not providing LOC to such generators also provides an incentive to ignore PJM's dispatch signals to pursue higher energy market revenues.[46]

22.     Lackawanna further argues that PJM's failure to provide adequate advance notice of the stability limit may have also prevented other generators from taking additional measures to maintain system reliability.[47]  Lackawanna also argues that it is unjust and unreasonable to withhold LOC from generators that are curtailed as a result of PJM's decision to take the Juniata-Sunbury line out of commission for three weeks of maintenance.[48]  Lackawanna states that PJM represented to the Commission that such outages were temporary, but the extended outage here cost Lackawanna millions of dollars.[49]

## III.     **Notice and Responsive Pleadings**

23.     Notice of the complaint was published in the *Federal Register*, 89 Fed. Reg. 6511 (Feb. 1, 2024) with interventions, comments, and protests due on or before February 26, 2024.  Timely motions to intervene were submitted by Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor for PJM (Market Monitor), Constellation Energy Generation, LLC, American Electric Power Service Corporation, PPL Electric Utilities Corporation, Public Citizen, Inc., Old Dominion Electric Cooperative, Calpine Corporation, NRG Business Marketing LLC, and Midwest Generation, LLC.  On February 23, 2024, PJM submitted an answer in response to the complaint.  On March 11, 2024, the Market Monitor submitted an answer in support of PJM's answer.  On March 12, 2024, Lackawanna submitted an answer in response to PJM's answer and the Market Monitor's answer.  On March 28, 2024, PJM submitted another answer in response to Lackawanna's answer.  On April 10, 2024, Lackawanna filed another answer in response to PJM's March 28 Answer.

---

[46] *Id.* at 28.

[47] *Id.*

[48] *Id.*

[49] *Id.* at 28-29.

Docket No. EL24-64-000                                                                    - 9 -

A. **PJM Answer**

24.     PJM argues that the Tariff is clear and unequivocal: "A Market Seller of a unit…
that is reduced using a generator output constraint to honor a stability limitation is not
eligible for credits…."[50]  PJM states that the Commission's order approving this language
determined that there is no lost opportunity when units are backed down for stability
limitations.  PJM argues that Lackawanna's arguments represent a collateral attack (or
out of time request for rehearing) of the Stability Limits Order.[51]

25.     In response to Lackawanna's argument that it did not have notice that its facility
could be subject to stability limitations or that stability-limited generators are ineligible
for LOC, PJM states that PJM Manuals 28, 11, 3, and 3B are replete with explicit
references to stability-limited generators being ineligible for LOC, and the potential that
stability limits for specific units may change as corresponding system conditions
change.[52]  PJM notes that the version of Manual 3B in effect during the Juniata-Sunbury
Outage provided explicit notice that the units identified in the table were not definitive or
binding, and could be subject to change based on evolving system conditions and the
output of PJM's TSA tool.[53]  PJM contends that it would be physically and
technologically impossible for PJM to instantaneously update the table in Manual 3B to
reflect system conditions as they occur in real-time, although PJM notes that it did in fact
update the table in Manual 3B as soon as practicable in this particular circumstance.[54]

26.     PJM notes that the Stability Limits Filing included only a single component of a
broad package of reforms that was mainly implemented through the Manuals, and that
"[t]he sole objective… is to clarify that LOC is not the appropriate mechanism to

---

[50] Answer at 5 (quoting PJM, Intra-PJM Tariffs, OATT, attach. K (App.), § 3.2
(60.0.0), §3.2.3(f); *id.* OA, Schedule 1, § 3.2 (Market Buyers) (60.0.0), § 3.2.3(f)).

[51] *Id.* at 6-7.

[52] *See id.* at 7-12 (quoting PJM, *PJM Manual 28: Operating Agreement
Accounting* § 5.2.6 (Dec. 14, 2023), https://pjm.com/-
/media/documents/manuals/m28.ashx (PJM Manual 28); PJM, *PJM Manual 11:
Energy & Ancillary Services Markets Operations* §§ 2.18, 2.18.1 (Dec. 14, 2023),
https://pjm.com/-/media/documents/manuals/m11.ashx (PJM Manual 11); PJM Manual 3
§ 3.9, 3.9.1).

[53] *Id.* at 12-13.

[54] *Id.* at 13.

compensate units for output curtailments associated with generation stability limits."[55]
PJM also notes that the Commission did not require this information to be included in the
Tariff, rather than the Manuals, despite this issue being raised in that proceeding.[56]

27.     PJM argues that Lackawanna attempts to retroactively import binding exclusions
into the administrative record of that proceeding that do not exist, including an imaginary
numerical day cap on the duration of a stability limitation and an imaginary requirement
that PJM provide engineering evidence to Lackawanna justifying its unit-specific
limitation.[57]  PJM contends that Lackawanna's attempt to ignore the Tariff's explicit
prohibition on paying LOC is completely undermined by PJM's overt representations in
its Stability Limits Filing that the purpose of the restriction was to clarify that this
language does not apply to units backed down for stability limitations.[58]

28.     PJM asserts that exceeding PJM-assigned stability limits is not permitted in the
first instance under the PJM Operating Agreement, North American Electric Reliability
Corporation (NERC) reliability standards, and Lackawanna's own Interconnection
Service Agreement.[59]  PJM contends that, under the PJM Operating Agreement,
Lackawanna is not permitted to "elect" to ignore its PJM-designated stability limit, or the
process for establishing stability limits under the PJM Manuals.[60]  PJM states that NERC
reliability standards IRO-001-4 and TOP-001-5 similarly do not permit Lackawanna to
"choose" to ignore its PJM designated stability limit.[61]  PJM also asserts that
Lackawanna's Interconnection Service Agreement requires it to operate its facility in a
"safe and reliable manner."[62]

---

[55] *Id.* at 15-16 (quoting Stability Limits Filing at 10-11).

[56] *Id.* at 16.

[57] *Id.* at 16-17.

[58] *Id.* at 17.

[59] *Id.* at 18.

[60] *See id.* at 18-20.

[61] *Id.* at 20-21.

[62] *Id.* at 21-22 (quoting PJM, Service Agreements Tariff, PJM SA No. 3837
Among PJM, Lackawanna Energy and PPL EU (3.0.0), §4.1).

29.     PJM argues that Lackawanna does not understand the basic implementation of
PJM's operating procedures and their relationship to N-1 contingencies.[63]  PJM states
that when a system element underlying a base case comes out of service (in this case, the
Juniata-Sunbury line), PJM is required to identify and plan for the next contingencies,
based on the changed conditions.  PJM states that this is normal operating practice
applied to all generators when system conditions modify base modeling cases.[64]  PJM
states that once an element on the system is out of service, regardless of planned or
forced, that new system state becomes the base case or "N" and the subsequent
contingency analysis would then be considered an N-1 contingency, and not an N-2
contingency as Lackawanna represents.

30.     PJM states that the fact that Lackawanna has relays has no bearing on whether it is
entitled to LOC payments.[65]  PJM notes that protective relaying by nature does not
prevent instability or guarantee that generator equipment will not be damaged, whether
the scheme is an "Out-of-Step" protection scheme or an impedance relaying scheme.[66]
PJM also asserts that the Commission directly addressed the question of generator relays
and their relevance to the eligibility of stability-limited generators for LOC payments in
the Stability Limits Order and found that there was no obligation to provide LOC
payments to such generators.[67]

## B.     Market Monitor Answer

31.     The Market Monitor notes that the Commission approved the rules prohibiting
LOC payments for actions taken to maintain stability limits finding that, "there is no lost
opportunity cost and operating above the stability limit to achieve higher energy market
revenues does not constitute a legitimate opportunity."[68]  The Market Monitor notes that
the Commission's order refutes Lackawanna's argument that its installation of protective
equipment should exempt it from the rule prohibiting LOC payments.  The Market
Monitor states that the Commission found that, "even for generators that are equipped
with the relaying discussed herein, we remain unpersuaded that there is a legitimate

---

[63] *Id.* at 23.

[64] *Id.* at 24.

[65] *See id.* at 25.

[66] *Id.* at 25 (citing Affidavit of Matthew Wharton, PE, at ¶¶ 26-28 (Wharton Aff.)).

[67] *See id.* at 26-27.

[68] Market Monitor Answer at 3 (quoting Stability Limits Order, 178 FERC
¶ 61,111 at P 31).

opportunity to operate above stability limits that would obligate PJM to provide LOC payments."[69]

32.    The Market Monitor argues that the Complaint is a collateral attack on the Commission's prior orders.[70]  The Market Monitor states that Lackawanna's filing introduces no facts that indicate that an uplift payment for LOC is due to Lackawanna.[71]

33.    In response to Lackawanna's arguments that it lacked sufficient notice, the Market Monitor contends that Schedule 1 of the Operating Agreement and the Manual provisions cited by PJM clearly state the rules.[72]  The Market Monitor also states that there was an N-1 contingency under the facts of the Complaint because the Juniata-Sunbury Outage changed the base status of the system during the relevant time period.

34.    The Market Monitor states that Lackawanna has not met its burden to show that PJM did not implement the market rules in a just, reasonable, and not unduly discriminatory manner and that PJM has reasonably explained the basis for its actions.[73]

### C.    Lackawanna Answer

35.    Lackawanna argues that the Tariff on file with the Commission in eTariff and on PJM's website omits the provision approved in the Stability Limits Filing that contains the prohibition on the payment of LOC to generators that are curtailed to mitigate stability limitations.[74]  Lackawanna contends that the rate on file, therefore, did not restrict LOC payments to Lackawanna during the Juniata-Sunbury Outage.  Lackawanna argues that, accordingly, it did not have proper notice that prohibition existed and applied to them.[75]

36.    Lackawanna argues that, though the Commission approved this language in June 2022, it was superseded on October 1, 2022, and as such the effective Tariff includes no

---

[69] *Id.* (quoting Stability Limits Order, 178 FERC ¶ 61,111 at P 31).

[70] *Id.*

[71] *Id.* at 4.

[72] *Id.*

[73] *Id.* at 5.

[74] Lackawanna Answer at 3.

[75] *Id.* at 3-4.

such provision.[76]  Lackawanna additionally notes that PJM has not corrected its Tariff or Operating Agreement, despite being on notice of the provision's omission for at least seven months.[77]

37.     Lackawanna also argues that its curtailment was not "temporary," as the term is used in the Stability Limits Filing.[78]  Lackawanna states that NERC's "Reliability Guideline: Methods for Establishing IROLs" states that transmission operators may only exceed system operating limits (SOL) for a maximum of thirty minutes.[79]  Lackawanna notes that the PJM Manual 3 similarly contemplates restoring "PJM RTO conditions within 30 minutes to a level that restores operation within normal ratings and protects against the consequences of the next malfunction or failure."[80]

38.     Lackawanna contends that the Wharton Affidavit in PJM's Answer confirms that Lackawanna was curtailed to maintain system reliability: "the initial event may cause additional stability concerns completely exogenous to Lackawanna, such as separations and/or loss of customer loads."[81]

39.     Lackawanna also maintains that it was not curtailed to prevent loss of synchronization during an N-1 contingency and that PJM's argument is inconsistent with the well-understood definitions of N-1, N-1-1, and N-2 contingencies.[82]  Lackawanna states that, as PJM has explained elsewhere, "[a]n N-1 contingency refers to the unexpected failure or outage of a single system component, such as a generator, transmission line, circuit breaker, switch, or other electrical element."[83]  Lackawanna asserts that the Commission has elaborated that an N-1-1 contingency, on the other hand, "is a sequence of events consisting of an initial loss of a single generator or transmission element, followed by system adjustment, followed by another loss of a single generator

---

[76] *Id.* at 4-5.

[77] *Id.* at 5.

[78] *Id.*

[79] *Id.* at 6.

[80] *Id.* (quoting PJM Manual 3, § 2.1).

[81] *Id.* (quoting Wharton Aff. at ¶ 30).

[82] *Id.* at 7.

[83] *Id.* (quoting PJM, Report on Price Formation Issues, Docket No. AD14-14-000, at 15 n.12 (filed Feb. 17, 2016) (emphasis added)).

or transmission element," while "[a]n N-2 contingency is the simultaneous loss of two transmission elements or generators."[84] Lackawanna contends that, applying these definitions, the Juniata-Sunbury Outage was an N-1 contingency and any subsequent contingency would have been an N-1-1 contingency if it occurred sequentially, or an N-2 contingency if it occurred simultaneous with the Juniata-Sunbury Outage.[85]

40.    Lackawanna states that, contrary to PJM's explanation, an N-1-1 contingency does not "become" an N-1 contingency immediately upon the occurrence of an N-1 contingency.[86] Lackawanna states that according to TPL-001-4, the "base case" or "Category P0," occurs when a system does not have any contingencies and only includes "known outage(s) of generation or Transmission Facility(ies) with a duration of at least six months," which is far longer than the 23 day outage here.[87]

41.    Lackawanna also argues that the PJM Manuals do not provide adequate notice because the question of what constitutes a "stability limitation" is addressed in the Stability Limits Order.[88] Lackawanna argues that, for the same reason, the Commission should reject PJM's argument that it is not bound by its proposed definition of "stability limitations" in its Stability Limits Filing.[89]

42.    Lackawanna reiterates that, alternatively, the Tariff is unjust and unreasonable because it is inconsistent with the incentive structure the Commission sought to promote in the Stability Limits Order.[90] Lackawanna asserts that given that PJM justified its Stability Limits Filing by arguing that LOC payments would create a disincentive for market sellers to take risk mitigation measures, it is not just or reasonable for PJM to withhold LOC from generators that were not apprised of impending stability limitations until the last possible moment, thereby depriving them of the ability to mitigate or hedge

---

[84] *Id.* (quoting *Price Formation in Energy & Ancillary Servs. Mkts. Operated by Reg'l Transmission Organs. & Indep. Sys. Operators*, 153 FERC ¶ 61,221, at P 30 n.61 (2015)).

[85] *Id.* at 7-8.

[86] *Id.* at 8.

[87] *Id.* (quoting NERC, Reliability Standard TPL-001-4, Transmission System Planning Performance Requirements, at 2 (emphasis added by Lackawanna)).

[88] *Id.* at 8-9.

[89] *Id.* at 9.

[90] *Id.* at 10.

Docket No. EL24-64-000                                                              - 15 -

such risks.  Lackawanna also states that it is unreasonable to withhold LOC from generators for multi-week outages that they cannot meaningfully hedge.  Lackawanna argues that PJM's interpretation of the Tariff would also undermine the economic rationale undergirding the Stability Limits Order, in which the Commission reasoned that generators that install relays and safety equipment to protect their own assets do not need financial incentives to do so.[91]  Lackawanna states that it is not economically rational and indeed is unjust and unreasonable for PJM to withhold LOC from generators that install equipment, like protective relays, that NERC and PJM have both identified as important to maintain reliable power system operations when stability limitations are in effect.

43.     Lackawanna argues that its complaint is not a collateral attack because it is only asking the Commission to enforce the Stability Limits Order.[92]  Lackawanna argues that the Stability Limits Order was predicated on a notion that generators do not suffer a lost opportunity if they are curtailed temporarily to prevent damage to the generator in the event of loss of synchronization during an N-1 contingency and that those circumstances are not present here.[93]  In any event, Lackawanna argues, such challenges are permissible given that the Commission may find that previously approved rates, rules, or practices are unjust and unreasonable in a later proceeding.[94]

   **D.      PJM's March 28 Answer**

44.     PJM argues that LOC payments are designed to compensate generators for making a choice – namely, choosing not to pursue an "opportunity" to earn revenues in the energy markets, and instead taking an alternative operational action.[95]  PJM contends that Lackawanna is not legally permitted to "choose" to ignore its PJM-designated stability limitation.[96]  PJM additionally argues that generating above a PJM-designated stability limit on purpose, in order to pursue energy market revenues, is an extremely unsafe

---

[91] *Id.* at 10-11.

[92] *Id.* at 11.

[93] *Id.* at 11-12.

[94] *Id.* at 12.

[95] PJM March 28 Answer at 2.

[96] *Id.* at 3.

operational action that is inconsistent with the most basic tenants of Good Utility Practice.[97]

45.     In response to Lackawanna's argument that it was deprived of notice because the applicable provision was not in eTariff, PJM notes that the eTariff website contains an explicit disclaimer that it "does not necessarily represent the rates or terms and conditions of service on file at any particular point in  time" and that "[r]eference should be made to the Commission orders to establish the filed rates or terms and conditions of service."[98] PJM states that Commission action on a specific tariff record (even if that action occurs years after the tariff record is filed) will make that tariff record automatically supersede any subsequent versions of that tariff record that were filed and accepted prior to the Commission action.[99]  PJM states that, while it strives to submit "clean-up" filings when possible, continual and rapid pace of changes to the Tariff make it difficult.

46.     PJM asserts that Lackawanna's references in the NERC reliability standards and PJM's Manual do not show that "temporary" stability limitations are intended to be of a short duration (counted in minutes or hours) rather than apply throughout longer, multi-week outages.[100]  PJM asserts that these references illustrate the necessity for PJM to quickly correct violations of interconnection reliability operating limits (IROL)/ System Operating Limits (SOL), which include stability, once they are occurring on the system in real-time (e.g., PJM identifies a stability violation occurring on the system at 13:00, and would need to have it resolved by 13:30).[101]

47.     PJM explains that, when Lackawanna's stability limit was imposed, there was no identified IROL/SOL violation presently occurring on the system in real-time.[102]  Rather, PJM states the stability limit was imposed because the TSA tool indicated a potential threat to Lackawanna's facility if it continued generating at its normal output.  PJM states that if Lackawanna exceeded its stability limit, it could catastrophically damage its facility if the N-1 contingency occurred, and the facility could then potentially risk

---

[97] *Id.* at 4.

[98] *Id.* at 5-6.

[99] *Id.* at 6.

[100] *Id.* at 7.

[101] *Id.* at 8.

[102] *Id.* at 9.

putting the system into an insecure state and violating IROL/SOL limits (PJM would then be required to take actions to solve those IROL/SOL violations within 30 minutes).

48.    PJM states that Lackawanna misunderstands PJM's basic operating practices.[103] PJM asserts that it plans in accordance with Transmission Planning standards, but that these standards control for the planning horizon, which only encompasses beyond one year, and are reserved for PJM's non-operational NERC functions.[104]  However, PJM contends that these functions do not govern how PJM conducts its real-time operations.[105] PJM states that, during real-time operations, PJM, designates the current system topology as the base case and when changes occur on the system, such as lines being removed or restored to service, the new topology is the new base case.[106]

### E.    Lackawanna April 10 Answer

49.    Lackawanna states that PJM misconstrues its complaint by claiming that Lackawanna believes it should not be obligated to follow dispatch instructions.[107] Lackawanna states that the Complaint is clear that this is not the case.

50.    Lackawanna argues that a disclaimer on the eTariff website stating that it may not always be accurate does not excuse the absence of this provision from the Tariff.[108] Lackawanna additionally argues that this does not account for why the provision is also absent from the Tariff on PJM's website.[109]  Lackawanna further contends that this cannot be dismissed as a timing issue, as the provision has been missing for 18 months.[110] Lackawanna argues that the provision on which PJM relies has been superseded and that

---

[103] *Id.* at 10.

[104] *Id.*

[105] *Id.* at 11.

[106] *Id.* at 12.

[107] Lackawanna April 10 Answer at 2.

[108] *Id.*

[109] *Id.* at 2-3.

[110] *Id.* at 3.

the courts have explained that the Commission must apply the provision on file with the Commission over a superseded provision.[111]

## IV.    Discussion

### A.    Procedural Matters

51.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2023), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

52.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2023), prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority.  We accept the answers of the Market Monitor, Lackawanna, and PJM, as they have provided information that assisted us in our decision-making process.

### B.    Substantive Matters

53.    The PJM Tariff provides that a generator is generally able to receive LOC payments when its output is reduced "due to a transmission constraint or other reliability issue."[112]  However, such payments are not available when the reduction in output is "to honor a stability limitation."[113]  Here, Lackawanna contends that PJM's refusal to compensate Lackawanna for its LOC during the Juniata-Sunbury Outage violates the Tariff.  We find that the Tariff does not provide for Lackawanna to receive LOC payments in the circumstances here, where its output was reduced to honor a stability limitation,, and accordingly, we deny the complaint.

54.    We begin with Lackawanna's argument that the Tariff provision preventing the LOC payment is not currently listed in eTariff or on PJM's website as the effective tariff.[114]  The posting on eTariff as the effective tariff does not contravene the

---

[111] *Id.* (citing *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 18 (D.C. Cir. 2014); *PJM Interconnection, L.L.C.*, 153 FERC ¶ 61,327, at PP 6, 14 (2015)).

[112] PJM, Intra-PJM Tariffs, OA, Schedule 1, § 3.2 (Market Buyers) (60.0.0), § 3.2.3(f).

[113] Stability Limits Order, 178 FERC ¶ 61,111 at PP 4, 29-31.

[114] The Commission's eTariff system does reflect the acceptance of this provision. PJM. Intra-PJM Tariffs, OA, Schedule 1, § 3.2 (Market Buyers) (51.0.0), § 3.2.3(f), http://etariff.ferc.gov/TariffSectionDetails.aspx?tid=1731&sid=291973.

Commission' acceptance of a tariff provision. As the Commission stated previously, "[w]hile eTariff is a useful tool for accessing Commission-accepted agreements, as noted in the disclaimer on the eTariff website, parties need to refer to 'the Commission orders to establish the filed rates or terms and conditions of service.'"[115] As PJM explains, the reason the provision no longer appears is due to overlapping filings that did not include the accepted Tariff language. In none of these proceedings did PJM propose to remove this Tariff language related to the prohibition on the payment of LOC to generators that are curtailed to mitigate stability limitations.[116] Accordingly, because the Commission issued an order accepting this Tariff provision and has issued no order approving its removal from the Tariff, this provision has not been superseded, as Lackawanna asserts, and it remains the rate on file. Further, PJM provided notice of the relevant Tariff provision and Lackawanna acknowledges the Commission's acceptance of it. Nonetheless, we require PJM to submit a compliance filing within 30 days of the date of this order to restore the language providing that stability limited generators are not eligible for LOC payments to eTariff, so that the rate on file is reflected in eTariff.[117]

55.    Lackawanna makes a series of arguments that the Tariff definition of stability limits is ambiguous and, thus, requires the Commission to resort to extrinsic evidence to interpret its meaning. As discussed below, we do not find the provision ambiguous or

---

[115] *PJM Interconnection, L.L.C.*, 162 FERC ¶ 61,138, at P 7 n.10 (2018). The Commission's website states "[t]he rendition of the tariff provisions and the status of these provisions is based on the best efforts of Commission staff, but does not necessarily represent the rates or terms and conditions of service on file at any particular point in time. Reference should be made to the Commission orders to establish the filed rates or terms and conditions of service." FERC, eTariff Public Viewer, https://etariff.ferc.gov/TariffList.aspx; *see also* FERC, eTariff Viewer Guide 3, https://www.ferc.gov/media/1599.

[116] *See* 18 CFR § 35.10(c) (2023) (requiring utilities to mark each tariff change).

[117] PJM Answer at 2 n.4. This illustrates the need for PJM to be more rigorous in making clean-up filings when it has made overlapping filings of the same Tariff record to ensure that the eTariff reflects the correct effective Tariff. As we recently reminded PJM, "whenever it has two or more filings of the same tariff record pending at the Commission, PJM is required to make a timely clean up filing after issuance of the Commission orders on both filings to ensure the rates on file are accurate." *PJM Interconnection, L.L.C.*, 186 FERC ¶ 61,148, at P 29 (2024). PJM also can mitigate this continuing problem of overlapping filings by taking advantage of eTariff's functionality and breaking its Tariff into much smaller records.

that Lackawanna's citation to extrinsic evidence supports its interpretation of the Tariff text.

56.     Lackawanna argues that the Commission should refer to PJM's Stability Limits Filing to understand what is meant by "stability limitation," as this term is not defined in the Tariff.  In that proceeding, PJM stated that "stability limits" is the term used to describe "*temporary limitations* on the output of generators that PJM places into effect during certain transmission outage conditions, so as to prevent transient instability on the Bulk Electric System ('BES') *from causing damage to those generators due to the loss of synchronization during an N-1 contingency*."[118]  Lackawanna argues that its curtailment does not satisfy any of these criteria, and that it accordingly lacked notice that this Tariff language would apply to them.

57.     Lackawanna first argues that it was not subject to a "stability limitation" because its curtailment was not *temporary*, as it lasted 23 days.  However, there is nothing in the Tariff or the Stability Limits Filing that defines what is meant by temporary or creates any cap on the number of days that a generator may face curtailment due to stability limits.  Here, the Juniata-Sunbury Outage lasted from May 19, 2023 through June 10, 2023, which perhaps led to a longer duration stability limitation than Lackawanna anticipated, but is nevertheless a temporary period of time.

58.     Lackawanna points to PJM's Manuals and standards from NERC that provide that transmission operators may only exceed system operating limits for a maximum of 30 minutes.[119]  According to Lackawanna, this provides further evidence that the term "temporary" is intended to refer to shorter term events.  But this argument conflates violations of IROLs with actions taken to prevent such violations.  Violations of IROLs must be mitigated within a short timeframe because such violations carry the risk of unacceptable levels of instability, uncontrolled separation, or cascading outages.[120]   The fact that exceedance of IROLs must be mitigated within the timeframe established by the NERC Standards does not establish a definition of the term "temporary," much less one that has any bearing on the stability limitation applied to Lackawanna here.

---

[118] Stability Limits Filing at 2 (emphasis added).

[119] *See* PJM Manual 3, § 2.1; NERC, *Reliability Guideline: Methods for Establishing IROLs* 92 (Sept. 2018), https://www.nerc.com/comm/RSTC_Reliability_Guidelines/Reliability_Guideline_Meth ods_for_Establishing_IROLs.pdf.

[120] *See* NERC, *Glossary of Terms Used in NERC Reliability Standards*, https://www.nerc.com/pa/Stand/Glossary%20of%20Terms/Glossary_of_Terms.pdf (Dec. 1, 2023) (defining IROL).

59.     Next, Lackawanna argues that the curtailment was not done to *prevent damage to its generator* because its facility had equipment installed that would have prevented damage to the generator in the event of a transient instability.  The Tariff provision provides no such exemption.  In fact, in the Stability Limits Order, the Commission specifically addressed this argument and found that such facilities are nonetheless still ineligible to receive LOC payments when they are stability-limited:

> [W]e see no obligation for PJM to provide LOC payments to generators who have chosen to install safety relaying equipment to protect their own equipment.  More generally, we agree with PJM that… it has the responsibility to prevent or mitigate damage to generating facilities and ensure the integrity of the PJM system by establishing appropriate stability limits; therefore, even for generators that are equipped with the relaying discussed herein, we remain unpersuaded that there is a legitimate opportunity to operate above stability limits that would obligate PJM to provide LOC payments.[121]

60.     Furthermore, and as noted in the Wharton Affidavit, installation of out-of-step (OOS) relay protection does not eliminate the impacts of loss of synchronization on generator equipment; it simply disconnects the generator before this condition can cause catastrophic damage.[122]  OOS relays must operate to block tripping for stable power swings, as well as open circuit breakers at a phase angle that minimizes duty on circuit breakers.[123]  Within this timeframe, system instability and generator pole slip will still result in stress on mechanical equipment that results in significant wear and reduction in the life of such equipment.  We disagree with Lackawanna's assertion that it has an incentive not to follow PJM dispatch instructions; continuing to operate above stability limits despite such consequences simply based on having OOS protection is not consistent with Good Utility Practice for such generators.[124]

---

[121] Stability Limits Order, 178 FERC ¶ 61,111 at P 31 (footnotes omitted).

[122] *See* Wharton Affidavit at ¶¶ 26-27.

[123] *See* General Electric, *Out-of-Step Prot. for Generators* 6, https://www.gegridsolutions.com/products/applications/ger3179.pdf.

[124] *See* PJM, Service Agreements Tariff, PJM SA No. 3837 Among PJM, Lackawanna Energy and PPL EU (3.0.0), app. 1, § 1 (defining "Good Utility Practice" as "any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts

61.    Lackawanna also contends that its curtailment was not done in connection with an *N-1 contingency* because, in conversation with PJM personnel, it learned that it "was not curtailed to prevent damage to the facility that might occur during the Juniata-Sunbury Outage, but to mitigate harms that might occur in the event of *subsequent* contingency."[125]  Lackawanna suggests that to mean that PJM was planning for an N-2 contingency.[126]  Lackawanna misunderstands this aspect of PJM's transmission planning and operation.  An N-1 contingency, and contingencies generally, involve only unexpected failures or outages of system components.[127]  The outage of the Juniata-Sunbury facility was not unexpected, and is therefore not a contingency.  Rather, it defines the "N" system state.  This is consistent with NERC requirements to define SOLs such as that which resulted in the stability limitation placed upon Lackawanna, which require that "In the determination of SOLs*, the BES condition used shall reflect current or expected system conditions and shall reflect changes to system topology such as Facility outages*."[128]  Accordingly, we disagree with Lackawanna's contentions that the Stability Limits Filing suggests that the Tariff provision would not be applied in these circumstances.

62.    We next address Lackawanna's assertion that PJM failed to comply with its Manuals because Lackawanna is not listed in Manual 3B.[129]  Manual 3B identifies

---

known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition").

[125] Complaint at 18 (emphasis in original) (citing Affidavit of Kenneth Parkhill ¶ 13 (Parkhill Aff.)).

[126] *See* Parkhill Aff. ¶ 13.

[127] *See e.g.* NERC, *Glossary of Terms Used in Reliability Standards* 3, https://www.nerc.com/pa/Stand/MOD%20V0%20Revision%20RF%20DL/Glossary.pdf (2005) (defining contingency).

[128] NERC, Standard FAC-011-3 — System Operating Limits Methodology for the Operations Horizon R2.1, https://www.nerc.com/pa/Stand/Reliability%20Standards/FAC-011-3.pdf (emphasis added).

[129] We note that Manual 3B, on which Lackawanna relies, is not publicly available, and no party has provided it as a confidential exhibit.  We accordingly cannot verify whether PJM complied with the terms set forth Manual 3B.  In any event, the Manual cannot establish different rules from those in the Tariff.  *PPL EnergyPlus, LLC v. PJM Interconnection, L.L.C.*, 134 FERC ¶ 61,263, at P 42 (2011) (citing  *N.Y. Indep. Sys. Operator, Inc. v. Astoria Energy LLC*, 118 FERC ¶ 61,216, at P 32 n.17 (2007)).

stability limits based on static system conditions.[130]  While Lackawanna was not specifically identified in Manual 3B prior to the Juniata-Sunbury Outage, Manual 3B also provides that the units identified were not definitive or binding, and could be subject to change based on evolving system conditions and the output of TSA tool.[131]  This approach is consistent with other provisions of the PJM Manuals, which provide that the TSA tool computes stability limits based on real time network models,[132] and that "the stability limit will be updated periodically based upon ongoing topology changes."[133]  Furthermore, the Manuals also clearly indicate in multiple places that stability limited generators are ineligible for LOC payments.[134]  Thus, we find that PJM did not act inconsistently with its Manuals and that the Manuals provided Lackawanna with notice that its facility could be subject to stability limits that make it ineligible for LOC payments.

63.      Finally, Lackawanna argues that the Tariff provision regarding opportunity costs for stability limitations is unjust and unreasonable.  Lackawanna contends that the logic underlying the Stability Limits Order relies on the fact that, unlike generators that are curtailed to maintain transmission system reliability, stability limited generators have a "natural incentive" to forgo energy market revenues to protect their facilities, and thus do not need an extra incentive to follow PJM's dispatch instructions.  Lackawanna states that generators, like itself, that have safety equipment installed do not have this same "natural incentive."  However, as noted above, the Commission specifically addressed this

---

Regardless of whether a generator is listed in Manual 3B or not, the Tariff's prohibition on LOC payments when the generator's reduction in output is "to honor a stability limitation" still applies.

[130] *See* Wharton Aff. ¶¶ 13-15.

[131] PJM Answer at 12-13 (referencing Manual 3B).

[132] *See* PJM Manual 11 § 2.18; PJM Manual 3 § 3.9.

[133] PJM Manual 3 § 3.9.1.

[134] *See, e.g.*, PJM Manual 28 § 5.2.6 ("A generating resource that is reduced to honor a stability limitation is not eligible for lost opportunity cost credits for the MWh reduction associated with honoring the stability limit."); PJM Manual 11 § 2.18 ("Any generating unit or group of generating units that is reduced using a generator output constraint is not eligible for lost opportunity cost credits for the MW reduction associated with honoring the stability limit."); PJM Manual 11 § 2.18.1 Treatment of non-Real MW Stability Limits ("However, if a generating unit or a group of generating units are being reduced for a station stability limit, it will not be eligible for lost opportunity cost credits for the MW reduction associated with honoring the stability limit.").

Docket No. EL24-64-000                                                                          - 24 -

concern in the Stability Limits Order and held that "[PJM] has the responsibility to prevent or mitigate damage to generating facilities and ensure the integrity of the PJM system by establishing appropriate stability limits" and that therefore even generators that have such equipment do not have "a legitimate opportunity to operate above stability limits."[135]  Lackawanna also argues that this creates a disincentive for generators to take prophylactic measures to mitigate stability limits.  However, the Stability Limits Order also notes that "PJM's TSA tool models protective equipment, such as power system stabilizers and automatic voltage regulators, when establishing stability limits,"[136] which means that generators still have incentives to take steps to mitigate stability limits.

The Commission orders:

(A)     The Complaint is hereby denied, as discussed in the body of the order.

(B)     PJM is hereby directed to submit a compliance filing within 30 days of the date of this order, as discussed in the body of the order.

By the Commission.

( S E A L )

Debbie-Anne A. Reese,
Acting Secretary.

---

[135] Stability Limits Order, 178 FERC ¶ 61,111 at P 31; *see also supra* P 59.

[136] Stability Limits Order, 178 FERC ¶ 61,111 at P 31 n.35.

# Exhibit B

188 FERC ¶ 62,041
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Lackawanna Energy Center LLC                    Docket No.  EL24-64-001
                  v.
PJM Interconnection, L.L.C.

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(Issued July 22, 2024)

Rehearing has been timely requested of the Commission's order issued on
May 23, 2024, in this proceeding.  *Lackawanna Energy Ctr. LLC v. PJM
Interconnection, L.L.C.*, 187 FERC ¶ 61,089 (2024).  In the absence of Commission
action on a request for rehearing within 30 days from the date it is filed, the request for
rehearing may be deemed to have been denied.  16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713
(2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section.  As also provided in 16 U.S.C. § 825*l*(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.